Filed 10/26/15  P. v. Infante CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TOMAS RODRIGUEZ INFANTE,<br><br>    Defendant and Appellant. | B258176<br><br>(Los Angeles County<br>Super. Ct. No. KA100655) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Mike Camacho, Judge.  Affirmed.

Laura S. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, Alene M. Games, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Tomas R. Infante, defendant and appellant, killed his wife. Defendant claims on appeal that the trial court abused its discretion in dismissing a juror as a result of his expressing that it would be difficult for him to be a juror because the defendant looks like his uncle and because he noted that he and the defendant were Filipinos. Defendant asserts that the trial court removed the juror "out of an abundance of caution," which does not constitute good cause required for removal of a seated juror, and there was an insufficient basis to discharge the juror. According to defendant, the removal of the juror violated Penal Code section 1089[1] and his constitutional rights. We affirm the conviction.

# BACKGROUND

## A.     Summary of Facts Regarding the Crime

Defendant was married and had one child, who was 19-years-old. Defendant's wife worked as a nurse, and defendant no longer worked but spent his time gambling. Defendant and his wife had financial problems and fought often about defendant's gambling.

Defendant's son from a prior marriage, after a panicked call from defendant, arrived at defendant's house. Defendant said his wife was dead and that he "accidentally killed her." After going to a casino, defendant and his son drove away.

Meanwhile, because the wife did not appear at work, the daughter tracked her mother's cell phone and found her body in the car. The coroner stated she had three stab wounds to her neck and cheek, and five blunt force trauma lacerations to her head, face and hands.

---

[1]     All further statutory references are to the Penal Code.

Defendant was charged with premeditated murder (§ 187, subd. (a)) and trial was by jury. He did not present any defense. Defendant was found guilty as charged and sentenced to state prison for 25-years-to-life. Defendant filed a timely notice of appeal.

### B. Facts concerning Issue of Jury Discharge

During voir dire, prospective Juror No. 14—who became Juror No. 8—stated that jury duty would be difficult because he and his sister's family were home caregivers for his 86-year old mother who was. ill. The jury later was sworn in and pre-instructed. After the other jurors left the court room, before the presentation of any evidence, Juror No. 8 stayed behind to speak with the court. "The Court: Let's stay on record. Whatever it is—what's your concern? Juror No. 8: My concern is that I was looking at the back court. I didn't notice it until now. Just looks like my uncle. It's going to be harder for me. . . The Court: Who looks like your uncle? The accused, Mr. Infante? Juror No. 8: (Nodded head.) The Court: And when did you suddenly realize this? Juror No. 8: As I was looking. The Court: All right. All right. Let me ask you this. For the record, you are Juror No. 8, I believe; is that right? Seat no. 8? Juror No. 8: Yes. The Court: Juror No. 8 has expressed some concern now that he has had an opportunity to better view the accused, Mr. Infante. And Juror No. 8 is telling the court and counsel that Mr. Infante resembles a family member, specifically an uncle; is that correct, Juror No. 8? Juror No. 8: Yes, yes. The Court: Now, Juror 8, you heard what I mentioned when I read to you some preliminary instructions that you must not allow bias, sympathy, prejudice, or public opinion influence your decision. Included in that instruction is the word sympathy. You're expressing that you have some concern because Mr. Infante, the accused, resembles your uncle and you would never do anything to harm your uncle. Juror No. 8: I tried my best because I was looking up there and he looks like him. I'll do my best. The Court: Well, I'm sure you'll agree with me, Juror No. 8, Mr. Infante is not your uncle; is that correct? Juror No. 8: Yes. The Court: Because he's not your uncle, there is no reason for you to either favor his side or disfavor his side. You must be completely fair and objective to both sides. My question for you is can you set aside the

3

concern that you just expressed to us about resemblance of a family member? That has nothing to do with our case. You cannot allow that to influence how you decide this case. You must completely ignore that concern. It cannot control how you ultimately decide our case. You must do that. I mean, if you feel that you're not going to do that, then I need to know about it right now. Juror No. 8: It's really hard for me to say especially when it comes to the bottom of the line. The Court: Well, are you telling me, then, because of this concern you're expressing that, in the event the prosecution proves their case beyond a reasonable doubt and all jurors are required if that is the case to vote guilty, you very well may not vote guilty even if you're convinced by the evidence because of the concern you're telling me about? Is that a fair statement? Juror No. 8: I—like I said, it's kind of hard for me. I know he's Filipino. I'm Filipino. It doesn't have nothing to do with that, but it just reflects me that he looks like my uncle. I hope that there would be no problem when it comes to make my own decision. The Court: Well, I share your hope, but I'm also hoping that you will not allow that concern in any way to influence how you decide our case because that would be improper. You cannot allow that type of similarity between races of the accused and yourself and the familiarity that his features have with those of your uncle. You can't do that. That's not evidence in the case. You have to completely eliminate that from your thinking in our case. That's not evidence. That's improper for you to resolve the case on those issues. You need to separate them out. My question for you is, and I need a definite answer, can you separate those issues out from this case and not allow those to affect your decision. Juror No. 8: Yes, I will. The Court: I'm sorry? Juror No. 8: Yes, I will. The Court: Thank you very much, sir. You did the right thing, of course, by telling us about this. I'm not saying you're doing anything wrong. You're doing everything right. So thank you for expressing that concern. Go ahead and take your lunch break. We'll see you back at 1:30."

After Juror No. 8 exited the court room, the court and counsel discussed the issue presented by the juror. "The Court: Let's stay on record in the matter of *People versus Infante*. He remains present with counsel as well as the interpreter. People are

4

represented. We're outside the presence of all jurors. If the record doesn't already reflect it, it should reflect that the court's inquiry of Juror No. 8 moments ago was done outside the presence of all other jurors but all parties were present, including Mr. Infante. People, do you wish to be heard on this somewhat untimely revelation of Juror No. 8? Ms. Avalos [deputy district attorney]: Yes, Your Honor. Obviously had Juror No. 8 spoken up sooner and made any of these representations, the People would have exercised their peremptory challenge on him. Given the early nature of the proceedings, I'd ask that he be excused and be replaced with one of the two alternates. One of the things I'd also like to note is that, as he was speaking to the court, I noticed his eyes getting red. His voice was a little bit shaky as well, and he just expressed such reservations that I would have serious concerns that he would be able to render a verdict in this case. The Court: Mr. Kuiland. Mr. Kuiland [public defender]: Your Honor, I would object to his being relieved as a juror. I think that Juror No. 8 had ample opportunity to observe Mr. Infante throughout most of the day yesterday, throughout the morning when he had a better view of Mr. Infante. And I suspect that there may be an alternative reason for why he's doing it. That's because he is a caretaker. He expressed some pessimism in terms of—I believe it's his mother he's caring for in terms of anybody else's ability to be there for her. So I suspect that his saying Mr. Infante resembles an uncle is subterfuge, Your Honor. The Court: It could be. I agree with you there is a chance that he has ulterior motives for bringing this more recent concern to our attention because of his responsibilities with his mother at home, but it doesn't negate the fact that he has expressed some troubling concerns to the court with respect to his ability to be impartial. He mentioned that he is Filipino. He mentioned that he knows Mr. Infante is Filipino. He mentioned Mr. Infante resembles a family member. He insisted this would make it difficult for him to perform his obligation as a juror. Now, the court pressed him on those issues, ultimately convinced him to at least perhaps say what the court would want him to say, that is, that he could still perform his obligations. My impression of him is that he is a troubled person. He may have ulterior reasons to request being excused from this trial, but the most recent is the one that I think brings his

5

suitability into question. You know, the parties need a fair trial on this case. I can't see that the prosecution would get a fair trial with this particular juror given the representations that he has made, especially based upon race, racial identity. That is my concern regardless of whether or not he resembles a family member. I don't want any allegiance to one party over the other based upon racial identification. Granted, the People's witnesses, perhaps victim are of the same race. But I think it would be best to substitute No. 8 in for an alternate and bring into service alternate No. 1, which would be Juror No. 14. This will be done over the defense objection. Mr. Kuiland has made his position abundantly clear. Mr. Kuiland: Thank you, Your Honor. The Court: This is more so out of an abundance of caution than anything else. It will be done. And Juror No. 8 will be excused from this case at 1:30."

Following the recess, the trial court addressed the juror's concerns: "We're outside the presence of our sworn jurors, including alternates with the exception of Juror No. 8, of course. Juror No. 8 has been invited to enter the courtroom. [¶] Juror No. 8, based upon what you have expressed before the noon hour regarding your concerns about remaining objective and fair, the court is going to act, out of an abundance of caution, just to go ahead and excuse you from this case. We need individuals who are willing to be fair to both sides, follow the law as required. We're concerned whether or not you can maintain that responsibility throughout this case. So you're excused. Report to the assembly room upstairs. They'll tell you what you need to do. Please do not communicate with any of our remaining jurors regarding what has transpired between the court and yourself." Thereafter, one of the alternate jurors took Juror No. 8's seat.

Defendant contends that the trial court committed error in violation of his statutory and constitutional rights by discharging Juror No. 8 before trial.

6

**DISCUSSION**

**A.      Applicable Law and Standard of Review**

Section 1089 provides, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

If the trial court learns of a ground for dismissal of a juror, it "has an affirmative obligation to investigate." (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.)  The Supreme Court in *People v. Fuiava* (2012) 53 Cal.4th 622, 711-712 summarized the applicable principles as follows:  "Although we have long held that the decision to discharge a juror under section 1089 is committed to the trial court's discretion (*People v. Abbott* (1956) 47 Cal.2d 362, 371 [303 P.2d 730]), assessing the breadth of that discretion, at least with regard to the decision to discharge a seated juror, is more complex than it otherwise might appear.  Early on, we held that 'the trial court has at most a *limited discretion* to determine that the facts show an inability to perform the functions of a juror . . . .' ([*People v.*] *Compton* [(1971)] 6 Cal.3d [55,] 60, italics added [citing *People v. Hamilton* (1963) 60 Cal.2d 105, 124-127 [32 Cal.Rptr.4, 383 P.2d 412]].)  Subsequently, however, we revised that holding:  'The more modern rule provides that, under section 1089, a trial court "has *broad discretion* to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve."' ([*People v.*] *Boyette* [(2002)] 29 Cal.4th [381,] 462, fn. 19 [quoting *People v. Millwee* (1998) 18 Cal.4th 96, 142, fn. 19 [74 Cal.Rptr.2d 418, 954 P.2d 990]].)  Nonetheless, as we made clear in [*People v.*] *Barnwell* [(2007)] 41 Cal.4th 1038, regardless of how the scope of the trial court's discretion is described, an appellate court's review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather

7

under the 'demonstrable reality' test.  In *Barnwell* we explained the difference as follows: [¶]  The typical abuse of discretion standard involves an analysis of whether the trial court's decision is supported by '"substantial evidence,"' and 'has been characterized as a "deferential" standard.'  (*Barnwell, supra*, 41 Cal.4th at p. 1052.)  'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.  Once such evidence is found, the substantial evidence test is satisfied.  [Citation.]  Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.'  (*Ibid.*; see also [*People v.*] *Osband* [(1996)] 13 Cal.4th [622,] 666 [typically, '[a] court abuses its discretion when its ruling "falls outside the bounds of reason"'].)  [¶]  In contrast, '[t]he demonstrable reality test entails a more comprehensive and less deferential review.  It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.  It is important to make clear that a reviewing court does not *reweigh* the evidence under either test.  Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.  [¶]  In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.'  (*Barnwell, supra*, 41 Cal.4th at pp. 1052-1053.)  'That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.'  (*Id.* at p. 1052; see also *People v. Lomax* (2010) 49 Cal.4th 530, 589 [112 Cal.Rptr.3d 96, 234 P.3d 377] (*Lomax*) [on appeal, '"a somewhat stronger showing" than is typical for abuse of discretion review must be made to support' the decision to discharge a juror during deliberations].)"  (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 486 ['"The juror's inability to perform must appear as a "demonstrable reality" and will not be presumed'"].)

8

The Supreme Court explained the less deferential review, adding a requirement to "traditional substantial evidence review"—"that the record establish the actual basis for the trial court's decision. So long as it does, we ask only whether the evidence relied upon was sufficient to support that basis as grounds for dismissal; we do not independently reweigh the evidence or demand more compelling proof than that which could satisfy a reasonable jurist. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 560.) The court also stated, "However, '[b]oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court.' (*Ibid*.; see *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 57 [158 Cal.Rptr.3d 585, 302 P.3d 981]; *People v. Thompson* [(2010)] 49 Cal.4th [79,] 137.)" (*People v. Duff, supra,* 58 Cal.4th at p. 560.)

A sitting juror's actual bias renders him or her "unable to perform his duty" and accordingly, subject to discharge. (*People v. Lomax* (2010) 49 Cal.4th 530, 589.) The trial court is entitled to deference when the discharge of the juror is based on the trial court's actual observations of the jury and assessment of the juror's credibility. (*People v. Wilson* (2008) 44 Cal.4th 758, 832; *People v. Barnwell, supra,* 41 Cal.4th at pp. 1052-1053.)

### B.    Analysis

The colloquy between the juror and the trial court was the sole basis for the removal, and thus the facts upon which the trial court relied were a demonstrable reality. The trial court was able to observe the juror and make a determination as to the juror's state of mind when that juror made his statements, even if conflicting or ambiguous. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 987 [voir dire].)

Juror No. 8 raised the point that he and defendant were Filipino and that defendant looked like the juror's uncle. When questioned about his ability to be impartial, he replied that it would be "hard for me to say especially when it comes to the bottom of the line." The juror said on several occasions it would be hard for him to be impartial because defendant looked like the juror's uncle. These statements suggested that Juror

9

No. 8 was unable to perform the function of a juror because of his inability to be impartial. Removing Juror No. 8 was not an abuse of discretion or a statutory or constitutional violation.

Defendant claims that the trial court erred by stating he was discharging the juror "out of an abundance of caution." These words are in connection with the exercise of discretion, but the trial court said, "My impression of him is that he is a troubled person. He may have ulterior reasons to request being excused from the trial, but the most recent is the one I think brings his suitability into question." The trial court referenced the jurors' national origin (or racial identity) remarks—i.e., raising national identity and the appearance of defendant being similar to the juror's relative.

The trial court noted that the juror said it would be difficult for him to perform his obligations as a juror. The trial court pointed out that only after it pressed the juror to acknowledge he had a duty to be impartial, did the juror say what the trial court "would want him to say, that is, that he could perform his obligations."

Also noteworthy was the prosecutor's observations that were visible to the trial court that when the juror talked to the court, "I noticed his eyes getting red, his voice was a little bit shaky as well, and he just expressed such reservations . . . ."

From all of these facts, the trial court had a sufficient basis to conclude that the juror could not carry out his functions. The trial court did not err in removing the juror.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.

11